**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 17-cv-1037-WJM-GPG

BRUCE PANCZNER,

    Plaintiff,

v.

LESLEY A. FRASER, M.D.,

    Defendant.

---

## ORDER ON PENDING MOTIONS AND RULE 72(a) OBJECTION

---

Plaintiff Bruce Panczner sues Dr. Lesley A. Fraser ("Fraser") for medical malpractice.[1]  (ECF No. 1.)  Currently before the Court are four motions and an objection to a magistrate judge's nondispositive ruling:

- Fraser's Motion to Strike Plaintiff's Expert, Ken Zafren, M.D., Pursuant to Fed. R. Evid. 702 ("Motion to Strike Dr. Zafren") (ECF No. 63);

- Panczner's F.R.E. 702 Motion to Exclude Expert Testimony Relating to Frostbite Prevention Techniques, and Mr. Panczner's Alleged Negligence in Contracting Frostbite ("Comparative Negligence Motion") (ECF No. 64);

- Panczner's F.R.E. 702 Motion to Exclude Expert Testimony Regarding a Local Standard of Care ("Local Standard of Care Motion") (ECF No. 65);

- Panczner's Motion for Summary Judgment as to Defendant's Comparative

---

[1] The Court means no disrespect in not referring to Fraser as "Dr. Fraser," but there are many non-party doctors discussed in this order.  The Court finds it less confusing to reserve the "Dr." title for them, thus distinguishing them from Fraser (as a party).

Negligence Defense ("Summary Judgment Motion") (ECF No. 91); and

- Fraser's Objection to Magistrate's Order Denying Defendant's Motion to Strike Dr. O'Brien ("Rule 72(a) Objection") (ECF No. 99), which is directed at the September 14, 2018 order entered by U.S. Magistrate Judge Gordon P. Gallagher (ECF No. 95) denying Fraser's Motion to Strike Plaintiff's Untimely Disclosed Expert Witness, John O'Brien, M.D. ("Motion to Strike Dr. O'Brien") (ECF No. 53).

As it turns out, these motions and the objection are interrelated in many ways. For the reasons explained below, the Court: denies the Motion to Strike Dr. Zafren; grants the Local Standard of Care Motion, which in turn requires vacating Judge Gallagher's September 14, 2018 order, and therefore denies the Rule 72(a) Objection as moot; grants the Summary Judgment Motion, and in turn denies the Comparative Negligence Motion as moot, given that it differs from the Summary Judgment Motion only in form, not in substance. Finally, in the interest of justice, the Court will reopen expert discovery so that Fraser may remedy the flaws in his expert testimony that will become apparent below.

## I. LEGAL STANDARDS

Most of the pending motions are nominally brought under Federal Rule of Evidence 702, governing admissibility of expert testimony. But none of these motions raises a true Rule 702 issue. They raise, instead, matters particular to medical malpractice under Colorado law. The Court will therefore reserve the controlling standards for the sections in which they are applied.

In a similar vein, the Summary Judgment Motion has little to do with Federal Rule

of Civil Procedure 56.  It instead presents a purely legal argument.  Thus, the typical Rule 56 standard is irrelevant.

Finally, the Court would normally review Judge Gallagher's order under a "clearly erroneous or contrary to law" standard.  Fed. R. Civ. P. 72(a).  However, certain other rulings in this order eliminate a crucial predicate of the Judge's order, so no review is needed.  The Court will vacate this order as moot.

## II.  BACKGROUND

The basic facts are undisputed.  On February 9, 2016, Panczner and two friends rented snowmobiles from an outfitter near Aspen, intending to reach a backcountry hut.  But their snowmobiles repeatedly got stuck in deep snow.  While digging them out, Panczner's boots filled with snow.

Panczner and his friends could not make it to their destination.  They abandoned their snowmobiles and spent a night in a snow cave.  They were rescued the next morning, February 10, 2016.  Panczner was immediately transported to Aspen Valley Hospital and diagnosed with severe frostbite on his toes and feet.  An emergency room physician began a "rapid rewarming" procedure using hot water, and Panczner was admitted to the hospital under the care of Fraser, a general surgeon.

The following morning, February 11, Panczner asked Fraser about "tissue plasminogen activator" (tPA) treatment, which Panczner had learned about through Internet research while at the hospital, and which reportedly showed promise to decrease the likelihood of tissue loss from frostbite.[2]  Panczner further noted that the

---

[2] The Court will use the "tPA" abbreviation, which appears to be the most common.  Many of the parties' documents, quoted below, use slightly different abbreviations (sometimes more than one abbreviation in the same document) such as "TPA," "t-PA," and "tPa."

burn center at the University of Colorado Hospital (Anschutz campus) in Denver knew how to administer tPA for frostbite injuries. Fraser first told Panczner that there was no treatment in Denver that was not available in Aspen. But Fraser soon after contacted the burn center at University of Colorado Hospital, learned for the first time about tPA, and concluded that Panczner should be transported as soon as possible for that treatment.

A Flight-for-Life helicopter delivered Panczner to the University of Colorado Hospital in the afternoon of February 11, 2016, but by that time it was too late for tPA to have a beneficial effect. Eventually, doctors amputated all of Panczner's toes and parts of both forefeet.

Panczner now sues Fraser, claiming that, had he been timely administered tPA, he would have needed no or fewer amputations. Panczner does *not* claim that Fraser committed malpractice by failing to know about tPA as a frostbite treatment before Panczner arrived at Aspen Valley Hospital, but rather that Fraser had a duty, upon admitting Panczner as a frostbite patient, to inquire whether better treatments had been developed since Fraser had last been trained on frostbite care.

### III. ANALYSIS

### A. Motion to Strike Dr. Zafren (ECF No. 63)

Panczner has disclosed Dr. Ken Zafren as a retained expert. (ECF No. 53-4 at 1.) Panczner offers Dr. Zafren as "a board-certified emergency medicine physician with extensive experience in frostbite treatment. He has been retained to provide expert testimony in the field of frostbite treatment." (*Id.*)

Fraser moves to strike Dr. Zafren's expected expert testimony because Dr. Zafren is an emergency medicine specialist, not a general surgeon like Dr. Fraser.

Fraser relies on the following Colorado statute governing medical expert testimony, including cross-specialty testimony, in medical malpractice cases:

> No person shall be qualified to testify as an expert witness concerning issues of negligence in any medical malpractice action or proceeding against a physician unless he not only is a licensed physician but can demonstrate by competent evidence that, as a result of training, education, knowledge, and experience in the evaluation, diagnosis, and treatment of the disease or injury which is the subject matter of the action or proceeding against the physician defendant, he was substantially familiar with applicable standards of care and practice as they relate to the act or omission which is the subject of the claim on the date of the incident. The court shall not permit an expert in one medical subspecialty to testify against a physician in another medical subspecialty unless, in addition to such a showing of substantial familiarity, there is a showing that the standards of care and practice in the two fields are similar. The limitations in this section shall not apply to expert witnesses testifying as to the degree or permanency of medical or physical impairment.

Colo. Rev. Stat. § 13-64-401.[3]

Fraser focuses on the second-to-last sentence, requiring "a showing that the standards of care and practice in the two fields are similar." Fraser cites deposition testimony establishing that Dr. Zafren has never practiced general surgery, is not familiar with how frostbite treatment is taught to general surgeons, and so forth. (ECF No. 63 at 5.) Accordingly, Fraser argues that Dr. Zafren is "unqualified to opine about general surgery standard of care issues." (*Id.* at 4–5.)

Panczner responds that Fraser is misreading the statute to mean that Dr. Zafren

---

[3] This is a state-law rule of evidence. "The admissibility of evidence in diversity cases in federal court is generally governed by federal law." *Blanke v. Alexander*, 152 F.3d 1224, 1231 (10th Cir. 1998). But § 13-64-401, although evidentiary in nature, also appears to be "substantive" (and therefore controlling in federal court) in the same way as, say, Colorado's collateral source rule. *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 880 (10th Cir. 2006). Moreover, no party argues that § 13-64-401 does not apply in federal court. The Court will therefore apply it as controlling law.

must be qualified to discuss the standard of care for general surgeons in all contexts. (ECF No. 81 at 12.) Panczner argues that the statute's phrase "a showing that the standards of care and practice in the two fields are similar" should be read as implying a clause from its preceding sentence, so that the requirement is more accurately articulated as "a showing that the standards of care and practice in the two fields are similar as to the disease or injury which is the subject of the claim." (*Id.* at 12.)

The Court need not resolve the parties' dispute over the statute's meaning in light of Panczner's theory of liability and Dr. Zafren's actual opinion. Panczner "acknowledges that in February 2016[,] [Fraser] was not aware of tPA as a potential frostbite treatment, and [Dr. Zafren does not] fault [Fraser] for this initial lack of knowledge." (ECF No. 88 ¶ 2.) In other words, Panczner does not argue that the general surgery standard of care in February 2016 required use of tPA to treat frostbite. Panczner's theory, rather, is that Fraser "had an affirmative duty to take timely steps to become aware of this treatment, either by conducting medical research, or by contacting a frostbite expert." (*Id.* ¶ 3.) According to Panczner, therefore, when Fraser admitted him for frostbite treatment, the standard of care required Fraser to determine if there was something more he should know about frostbite treatment.

Panczner supports his view with Dr. Zafren's report, where he frames the duty as one imposed on all physicians who undertake care for "any condition":

> As for any condition, a physician, regardless of specialty, who treats a patient for frostbite, must either be an expert in the evaluation and treatment of frostbite by education, training, experience and knowledge of the current literature or must consult with an expert in the management of frostbite. The questions to be answered by the consultation include the choice of appropriate treatment and whether care of the patient should be transferred to the physician being

consulted or to another physician.

(ECF No. 81-5 at 8; *see also* ECF No. 81 at 6.)  Dr. Zafren elaborated on this opinion in the following exchange during his deposition:

> Q. . . . if you're not alerted to a change in therapy in a particular area, it's often difficult for a person to be aware that there's a change because they have no reason to believe there's anything new?
>
> A. I don't agree with that.
>
> Q. Why not?
>
> A. Because if—if a person is not taking care of a problem daily and keeping up with the literature, I believe that they have to assume that there's something new or may be something new, and they have to go to a source, either an expert or Dr. Google to find—find out what's—what's the current thinking and also to review the specifics about the condition and the therapies.
>
> Q. So, is it your testimony that it's required for a physician who doesn't see a condition on a day-to-day basis that they need to go out and research that condition if they encounter it to make sure there's been no developments in therapy?
>
> A. Either that or speak to an expert.  They don't have to necessarily research it themselves. They can go to a review site or they can call an expert, someone who takes care of the condition regularly.

(ECF No. 81-10 at 20.)

If Dr. Zafren limits his standard-of-care testimony to the foregoing—essentially, an opinion that all physicians have a duty to question their prior training when a patient presents with a condition the physician does not frequently see—then § 13-64-401 is not a barrier to admissibility.  Applying that statute, the Colorado Court of Appeals has endorsed the idea that a physician with a different specialty than that of the defendant may, consistent with the statute, opine that the relevant standard of care is a "general

standard of care common to the medical profession, . . . applicable to any physician."

*Hall v. Frankel*, 190 P.3d 852, 859 (Colo. App. 2008).  This decision is from an

intermediate appellate court, and so is not controlling on a federal court sitting in

diversity.  *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240 (10th Cir. 2003).

But it should usually be followed "unless [the Court] is convinced by other persuasive

data that the highest court of the state would decide otherwise."  *West v. AT&T Co.*, 311

U.S. 223, 237 (1940).  The Court is not otherwise persuaded, and so follows *Hall*'s

approach.

If Dr. Zafren has made a sufficient showing that the standard of care in the

circumstances Fraser faced when treating Panczner is the same for all physicians, then

he has necessarily made "a showing that the standards of care and practice in the two

fields [emergency medicine and general surgery] are similar."  Colo. Rev. Stat. § 13-64-

401.  The statute does not define a sufficient "showing," nor have the parties pointed the

Court to any helpful case law.  In particular, Fraser (who bears the burden, since this is

his motion) has not provided the Court with case law suggesting that the proposed

expert's own say-so about the congruence of the standard of care is *not* enough of a

"showing."[4]  Nor has he shown that his own experts conclusively rebut Dr. Zafren's

claim that the relevant standard of care is universal—indeed, Fraser's experts fail to

address this portion of Dr. Zafren's opinion (a matter the Court will revisit below).

Accordingly, the Court finds that Panczner, through Dr. Zafren, has made a

---

[4] Panczner cites deposition testimony from other physician-experts in this case that
supposedly confirms the specialty-neutral standard of care.  (ECF No. 81 at 9–11.)  This
deposition testimony is ambiguous, but it is more accurately characterized as establishing that
general surgeons in hospitals with dedicated burn centers likely know about tPA, not that
Dr. Zafren's specialty-neutral, condition-neutral standard of care is, in fact, the standard of care.

sufficient showing that "the standards of care and practice in the two fields [emergency medicine and general surgery] are similar."  Colo. Rev. Stat. § 13-64-401.  The Motion to Strike Dr. Zafren will be denied.

**B.  Local Standard of Care Motion (ECF No. 65) and Rule 72(a) Objection (ECF No. 99)**

1.  <u>Origin of These Disputes</u>

Panczner made his Rule 26(a)(2) affirmative expert disclosures on March 9, 2018.  (ECF No. 53-4.)  In those disclosures, Panczner's only retained physician-expert (as compared to Panczner's treating providers, who are non-retained experts) was Dr. Zafren.  (*Id.* at 1.)  Dr. Zafren's expert report accompanied this disclosure, the most relevant portions of which have already been quoted above.

Fraser made his Rule 26(a)(2) affirmative expert disclosures on April 16, 2018.  (ECF No. 53-6.)  He disclosed two retained physician-experts: Dr. Scott McIntosh, an emergency medicine specialist, and Dr. Brad Nichol, a general surgeon practicing at a hospital in Glenwood Springs.  (*Id.* at 2–3.)  Dr. McIntosh's expert report contained, among many other opinions, the following statement about regional distribution of knowledge about tPA:

> Doctors that practice in an academic hospital in a geographic area where frostbite is prevalent are often aware of tPA for frostbite.  I would expect that the frostbite/burn surgeons at University of Colorado Anschutz would be aware of the potential benefits of tPA for deep frostbite. However, I would not expect the majority of emergency physicians and general surgeons in rural Colorado hospitals to be aware of this therapy.

(ECF No. 53-8 at 5.)  And Dr. Nichol's expert report contained, among many other opinions, the following, which also makes claims about regional distribution of knowledge about tPA:

With regard to whether Dr. Fraser should have had knowledge regarding the efficacy of tPA in the use of severe frostbite, Dr. Zafren is certainly focused on his niche of wilderness medicine where this may be a more known topic. Within this subculture of academic burn care and wilderness medicine, tPA may be a known option, but in the wide scope of general surgery or even trauma surgery, particularly in community hospitals such as Aspen Valley Hospital, it is not and was not at the time Dr. Fraser was treating Mr. Panczner. The reason may be multifactorial. The studies are weak as stated before, acute, severe frostbite is a relatively uncommon, and there has not been a national acceptance of tPA as a standard therapy for acute severe frostbite. Until the national surgical community disseminates a therapy as established, a general surgeon cannot be expected to know about and implement that therapy. It is impossible for a general surgeon to be aware of all emerging treatments. There is a vast volume of scientific papers and journals published every month. It is impossible to know or read every study that is published, such as the ones referred to above, without follow up trials to corroborate or confirm the results of tPa treatment.

I have attended the Trauma and Acute Care Surgery Conference for the last 11 years and frequently have attended lectures given by surgeons from Academic Burn Centers. Never once has tPA been mentioned as a treatment for severe frostbite. Not until after this occurrence with Mr. Panczner was there any clinical outreach by the University of Colorado Burn Unit to the mountain areas west of Denver, and that occurred as a result of Dr. Fraser's efforts. The physicians came to Vail Valley Hospital in the fall of 2017 to teach about burns and frostbite care. Before this, no local/mountain hospitals had a protocol for tPA infusion for frostbite care. Indeed, had this treatment been nationally accepted in February 2016, . . . Dr. Fraser and his group would have been aware of it. My experience in the western Colorado community, and in attending national surgical meetings, demonstrates that the general surgical community was not aware of the potential use of tPA for frostbite, and it was reasonable for Dr. Fraser to not be aware of it in 2016.

(ECF No. 53-7 at 3–4.)

On April 19, 2018, Fraser deposed Dr. Zafren. (*See* ECF No. 53-2.) Through

that deposition, Fraser developed facts about Dr. Zafren's lack of general surgery expertise (the same facts that Fraser relies on, above, in his argument to exclude Dr. Zafren's standard-of-care opinion).

On May 21, 2018, Panczner designated a rebuttal expert, Dr. John O'Brien, who is a general surgeon practicing at a hospital in Park City, Utah. (ECF No. 53 at 5; ECF No. 53-9 at 1.) His opinions largely address what he believes is reasonable to expect from a "rural" general surgeon in a "rural" hospital. (*Id.* at 3–5.) And he includes an opinion that matches, in substance, Dr. Zafren's opinion about the need to do more research when a patient presents with a relatively infrequent condition:

> I do not agree that we[,] as physicians, caring for patients, should be relegated to accepting well-known, decades old, treatment regimens that we are familiar with, and not reaching out to find what might be new and applicable to our current patient[']s needs. If a patient presents with a malady that is mundane and familiar[,] it is reasonable to go with what we, as physicians, know is the current accepted treatment. If, however, a patient presents to us with a "severe" clinical entity . . . and one with which we may not be so familiar . . . , then it is incumbent on us, and in fact [the] standard of care demands of us, that we should reasonably inquire as to whether there exist more up to date treatment modalities that suit our current patient[']s needs.

(*Id.*)

This sequence of events spawned two motions, one from each side. First, Fraser filed the Motion to Strike Dr. O'Brien. (ECF No. 53.) Fraser argued that Dr. O'Brien's report was a new (and inexcusably late) affirmative expert report presented in the guise of a rebuttal report, and was being offered now only because Panczner realized after Dr. Zafren's deposition that Dr. Zafren was not qualified to provide a standard-of-care opinion—leaving Panczner without needed expert testimony. (*Id.* at 5–6.) Panczner responded that Dr. O'Brien was appropriately disclosed as a

rebuttal expert because his opinions address the standard of care in mountainous or rural areas, which was—in Panczner's view—the "unexpected" focus of Fraser's experts' standard-of-care opinions. (ECF No. 55 at 6–8.) The Court referred the Motion to Strike Dr. O'Brien to Judge Gallagher. (ECF No. 54.)

Next, about six weeks after Fraser filed the Motion to Strike Dr. O'Brien, Panczner filed the Local Standard of Care Motion. (ECF No. 65.) Panczner argued that the Colorado Supreme Court has established that the applicable standard of care must be judged at a national level, not a regional or local level. (*Id.* at 5–6.) Fraser responded that his physician-experts (Drs. McIntosh and Nichol) were, indeed, offering opinions on the national standard of care. (ECF No. 80.) The Court did not refer the Local Standard of Care Motion to Judge Gallagher.

Judge Gallagher has, however, since denied the Motion to Strike Dr. O'Brien (*see* ECF No. 95), and that denial is what Fraser challenged in his Rule 72(a) Objection (ECF No. 99). Judge Gallagher found that Fraser's physician-experts had "reframed the issue" with their apparent focus on the practice of medicine in rural areas, and this was "a change in focus that [Panczner] should be allowed an opportunity to rebut." (*Id.* at 10.)[5]

In this light, the Local Standard of Care Motion and the Rule 72(a) Objection are interrelated. The Court will first resolve the Local Standard of Care Motion, because its outcome affects the Rule 72(a) Objection.

---

[5] Judge Gallagher also ruled that Dr. Zafren was qualified to testify under Colorado Revised Statute § 13-64-101. (*Id.* at 7–10.) The Court has ultimately reached the same conclusion, but for somewhat different reasons.

2.    Local Standard of Care Motion

In *Jordan v. Bogner*, 844 P.2d 664 (Colo. 1993), the Colorado Supreme Court held that "a physician who holds himself or herself out as a specialist in a particular field of medicine is measured against a standard commensurate with that of a reasonable physician practicing in that specialty," in contrast to "[a] nonspecialist physician," who "must act consistently with the standards required of the medical profession in the community where he or she practices."  *Id.* at 666.[6]  Accordingly, Panczner argues that opinions from Dr. McIntosh and Dr. Nichols that appear to argue for a rural-specific standard of care must not be admitted.  (ECF No. 65 at 5–6.)

Fraser agrees that "specialists have a national standard of care."  (ECF No. 80 at 5.)  He attempts to nuance this standard, however, by emphasizing *Jordan*'s language that "[a] physician's ability to conform to the specialist standard of care may be affected by the circumstances existing at the time and place of his or her performance."  844 P.2d at 667.  He then goes on to argue that the jury must compare his conduct "to reasonable practitioners in his own specialty, not 'super-specialists' or general surgeons who have advanced knowledge in the care of the same condition, such as academic surgeons who research frostbite."  (ECF No. 80 at 5.)  He continues, "Under Colorado law, he must be judged by what a reasonable physician practicing under the same or similar circumstances—in Aspen, Colorado—should have known and should have done."  (*Id.* at 6 (footnote omitted).)  Thus, he says, Dr. McIntosh's and Dr. Nichol's opinions "do[] not set up a local standard of care, but [are] concrete evidence

_____

[6] As before, this would appear to be a state-law rule of evidence, and not automatically applicable in federal court, even sitting in diversity.  But, also as before, the Court finds that the rule is "substantive" and so should control.  (*See* n.3, above.)

based on their own knowledge that use of tPA had not become a part of the standard of care for 'reasonable,' not academic or supra-specialist, physicians." (*Id.* at 7.)

Fraser's position appears misdirected. Dr. Zafren nowhere faults Fraser for not knowing about tPA's potential as a frostbite treatment when Panczner first presented to him. (*See* ECF No. 53-5 at 8–9 (criticizing Fraser only for failing to recognize his limited knowledge about frostbite treatment and failing to consult a specialist).) Dr. O'Brien—assuming his opinions are admissible—is even more explicit, acknowledging "there is reason to believe that in February 2016 there was not widely disseminated information to the rural communities that TPA was a viable treatment for severe frostbite." (ECF No. 53-9 at 3.)[7] Thus, Fraser does not need experts to testify about whether a reasonable general surgeon—in a rural area or otherwise—should have known about tPA.

Because Fraser's response fails to address Panczner's real argument, the Court will grant the Local Standard of Care Motion and will enter the order Panczner requests, namely, that Fraser's experts be precluded "from suggesting that general surgeons practicing in Aspen, or more generally in rural/mountain communities, are subject to a lower or different standard of care than general surgeons practicing in larger metropolitan areas." (ECF No. 88 ¶ 5.) Even so, it would seem that the local standard of care issue is only part of the problem. It appears Panczner should have moved to exclude Dr. McIntosh's and Dr. Nichol's standard-of-care opinions as simply irrelevant because a general surgeon's chances to stay up-to-date about new treatments like tPA is not a "fact [that] is of consequence in determining the action." Fed. R. Evid. 401(b).

---

[7] Consistent with his experts, Panczner, in his reply brief, states that "he does not fault [Fraser] for his initial lack of knowledge." (ECF No. 88 ¶ 3.)

Panczner did not bring such a motion, but nothing prevents him from filing a motion *in limine* at the appropriate time, or objecting at trial.  And, assuming the state of the record does not materially change between now and then, the Court would likely be constrained to grant such a motion or sustain such an objection.  Fraser would then be left without standard-of-care testimony except, perhaps, his own—which would be subject to obvious impeachment, given his interest in the outcome of the case.

It is frankly difficult to understand why Fraser asked Drs. McIntosh and Nichol to opine about whether knowing of tPA ahead of time was within a general surgeon's standard of care—a matter no longer in question, if it was ever in question, once Dr. Zafren issued his report.  But each party made strategic decisions with regard to their expert testimony.  Fraser makes a persuasive case, for example, that Panczner indeed sought Dr. O'Brien as a "rebuttal" expert not out of an actual need for a rebuttal expert, but out of fear that Dr. Zafren may not have been the right expert to retain.  And, as to that fear, Panczner's own words are important to note.  In his response brief opposing the Motion to Strike Dr. Zafren, Panczner included a parting request that if the Court found Dr. Zafren unqualified, it should grant "leave [to Panczner] to call Dr. O'Brien, currently designated as a rebuttal witness, during his case-in-chief.  Otherwise, [he] will have no standard-of-care expert, and will be unable to prove his case, a result which would constitute a grave injustice."  (ECF No. 81 at 15 n.3.)

Given that no trial date has yet been set, nor even a final pretrial conference, the Court trusts that Panczner would likewise recognize the "grave injustice" to Fraser if he is also left without a retained expert's testimony on the standard of care.  Accordingly, in the interest of substantial justice, the Court will reopen expert discovery to permit Fraser

to designate a rebuttal expert to Dr. Zafren—one who addresses when a general surgeon has a duty to question his or her received treatment protocols.  According to Dr. Zafren, this is a duty shared by all physicians regardless of specialty and regardless of the condition with which the patient presents, so it necessarily applies to a general surgeon.  Fraser's expert may address that as well, but the question the expert *must* address under *Jordan* is whether a reasonable general surgeon in February 2016, when faced with a patient presenting with the symptoms with which Panczner presented to Fraser, had a duty to explore treatment possibilities beyond what Fraser administered. *See* 844 P.2d at 666–67.[8]

### 3.    The Rule 72(a) Objection

Panczner insists that Dr. O'Brien was disclosed as a rebuttal witness in light of Dr. McIntosh's and Dr. Nichol's "unexpected" opinions that the standard of care differs between rural and urban areas.  (ECF No. 55 at 7; ECF No. 102 at 5.)  The Court has ruled that Panczner is entitled to an order precluding testimony about a location-specific standard of care.  Accordingly, the sole basis for disclosing Dr. O'Brien as a rebuttal expert no longer exists and, indeed, his testimony as to a rural standard of care would be inappropriate.  Panczner, by his own logic, must therefore withdraw Dr. O'Brien's

---

[8] To be clear, the Court has *not* ruled that Dr. McIntosh's or Dr. Nichol's standard-of-care opinions *are excluded*.  The Court has only explained why exclusion of those opinions appears inevitable, and the Court is attempting to avoid a potentially serious problem by giving Fraser another chance to obtain relevant standard-of-care testimony.  If Fraser wishes to press forward with the standard-of-care opinions he already has, the Court cannot stop him.  However, the Court notes that, whether Fraser obtains a rebuttal expert or not, the Court will not allow more than one expert witness per side to testify on the same subject, be it the standard of care, causation (the likelihood that a timely tPA regimen would have done any good), or any other matter.  To the extent Fraser calls any or all of his physician-experts, the Court will require him, per Rules 403 and 611(a), to ensure that those experts confine their testimony to matters not already addressed by another of Fraser's experts.

opinion.[9]  In this light, Judge Gallagher's order regarding whether Dr. O'Brien was properly disclosed as a rebuttal expert will be vacated as moot, and Fraser's Rule 72(a) Objection will be overruled as moot.

## C.    Comparative Negligence Motion (ECF No. 64) and Summary Judgment Motion (ECF No. 91)

The outfitter that rented snowmobiles to Panczner and his friends was formerly a defendant in this case, under the theory that it negligently provided the wrong kind of snowmobiles and bad advice.  (*See* ECF Nos. 1, 61.)  The outfitter prepared a comparative negligence defense, supported by an expert in snowmobile excursions who opined that Panczner was responsible for his own frostbite.  (ECF No. 64-4.)  Fraser has cross-endorsed the outfitter's expert.  (ECF No. 64-5 at 2.)  Dr. McIntosh also discusses frostbite prevention best practices without specifically opining that Panczner failed to follow those practices (ECF No. 53-8 at 2–3); and Dr. Nichol briefly opines that the severity of Panczner's frostbite was the result of "several poor decisions," on the way to arguing that tPA likely would not have helped even if timely administered (ECF No. 53-7 at 5).

These expected lines of testimony prompted Panczner to file his Comparative Negligence Motion, claiming that evidence of his allegedly poor decisions leading to frostbite is inadmissible as a matter of law because comparative negligence is not a defense in a medical malpractice action.  (ECF No. 64 at 5–7.)  Fraser responded that Panczner's motion was really one for summary judgment on Fraser's affirmative

---

[9] Even if this were not the case, Dr. O'Brien's opinions—stripped of his references to a rural standard of care—are verbose restatement of Dr. Zafren's opinions.  The Court would not allow both to testify at trial, for the same reasons already explained in n.8, and Dr. Zafren is Panczner's only designated *affirmative* expert on the matter.  Accordingly, only Dr. Zafren would be permitted to testify, as between him and Dr. O'Brien.

defense of comparative negligence. (ECF No. 79 at 5.) Somewhat later, Panczner filed his Summary Judgment Motion, repackaging the same argument in that procedural box. (ECF No. 91.) The Court agrees that the matter is more akin to a summary judgment question than a Rule 702 question, but both motions raise the same legal issue.

The Colorado Supreme Court has never decided the extent to which a medical malpractice defendant may assert comparative negligence against his or her former patient. The Court therefore must predict what the Colorado Supreme Court would rule if presented with the question in the context of this lawsuit. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

The closest the Colorado Supreme Court has come to addressing this issue is *P.W. v. Children's Hospital Colorado*, 364 P.3d 891 (Colo. 2016), where that court held that a hospital admitting a patient for suicide-prevention purposes cannot claim comparative negligence if the patient injures him- or herself through a suicide attempt. *Id.* at 896–99. But the Colorado Supreme Court's ruling was based on the notion that a medical provider's duty to use reasonable care can, in some circumstances, completely subsume an individual's duty to reasonably protect him- or herself from harm:

> If the duty undertaken by the defendant and the harm to the plaintiff precisely match—in that the purpose of the undertaking was to prevent the harm—then it would be improper to allow the defendant to use the occurrence of that type of harm as a defense, since that was the very thing [the defendant] was obliged to prevent.

*Id.* at 897 (internal quotation marks omitted). As part of this ruling, the court endorsed *Kildahl v. Tagge*, 942 P.2d 1283, 1285 (Colo. App. 1996), for the proposition that "a plaintiff's failure to provide an adequate medical history or cooperate in treatment can provide a basis for comparative negligence." *P.W.*, 364 P.3d at 897 n.6.

*P.W.* and *Kildahl* addressed questions of how comparative negligence should apply to the patient's actions *during* treatment.  Here, the thrust of Fraser's comparative negligence defense is Panczner's actions *before* seeking treatment—the very acts that led to the condition *for which he sought treatment*.  In that situation, the Court agrees with other decisions from this District that the Colorado Supreme Court, if presented with the question, would reject the notion that a physician-defendant can attempt to reduce a patient-plaintiff's liability by arguing that the patient-plaintiff caused his or her own maladies.  *Blatchley v. Cunningham*, 2017 WL 4333993, at *2 (D. Colo. June 21, 2017); *Spence v. Aspen Skiing Co.*, 820 F. Supp. 542, 544 (D. Colo. 1993).  To hold otherwise would be a sea change in the very notion of the medical standard of care.  It would endorse the idea that medical professionals may lawfully give otherwise substandard care to those who "deserve it" because they cause their own injuries.  The Court is aware of no jurisdiction that would allow its medical professionals to implement such a draconian standard, much less a jurisdiction where the highest court would endorse such a standard for purposes of tort liability.

Fraser counters that

> [Panczner's] negligence caused him to suffer severe, deep and extensive frostbite in his feet before he arrived at [Aspen Valley Hospital].  Due to the severity of [Panczner's] injuries, there was no treatment that would have avoided all tissue loss. . . . [Panczner] caused the exact injury for which he now seeks damages immediately prior to seeking care at [Aspen Valley Hospital].  If accepted, [Panczner's] argument would preclude a comparative fault defense based on a plaintiff's conduct prior to seeking care even when that conduct causes the claimed damages.  That result is not consistent with Colorado law or public policy, which provides that individuals have a duty to act with reasonable care for their own safety and that defendants should only be held liable for injuries that their negligence directly caused.

(ECF No. 98 at 12–13.)  Parts of this argument are correct but irrelevant, and parts are confused.

As to Colorado law and public policy about a duty to reasonably protect oneself from harm, *P.W.* shows that the duty is not unyielding to other policy concerns.  As for the supposed preclusion of any comparative negligence defense based on conduct prior to seeking care that caused the claimed damages, Fraser fails to distinguish causation from comparative negligence.  In this case, there appears to be a genuine dispute over causation, namely, whether Panczner's toes and feet had so deteriorated medically that tPA would not have helped anyway.  Fraser of course may argue against causation.  But causation necessarily turns on Panczner's condition when he arrived at Aspen Valley Hospital.  Nothing in the record suggests that anything Panczner did in contracting frostbite would distinguish him from any other patient presenting at Aspen Valley Hospital with frostbite of the same severity on the same extremities.  Thus, *how* he contracted frostbite is irrelevant to whether Fraser treated him properly.

The Court will therefore grant the Summary Judgment Motion, rendering the duplicative Comparative Negligence Motion moot.  Accordingly, the Court will not permit testimony or exhibits the obvious purpose of which is to support Fraser's comparative negligence defense, nor will the Court give a comparative negligence jury instruction.  This does not mean that no evidence at all may come in of Panczner allowing snow into his boots, failing to obtain dry socks, and other similar details to the extent they are necessary for the jury to obtain a coherent picture of what happened.  But little evidence on these matters is needed to give the jury a sufficient picture, and the Court will readily sustain any objection if it believes that Fraser has brought them up to sway the jury

20

against Panczner.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Fraser's Motion to Strike Plaintiff's Expert, Ken Zafren, M.D., Pursuant to Fed. R.

Evid. 702 (ECF No. 63) is DENIED;

2.     Panczner's F.R.E. 702 Motion to Exclude Expert Testimony Relating to Frostbite

Prevention Techniques, and Mr. Panczner's Alleged Negligence in Contracting

Frostbite (ECF No. 64) is DENIED AS MOOT;

3.     Panczner's F.R.E. 702 Motion to Exclude Expert Testimony Regarding a Local

Standard of Care (ECF No. 65) is GRANTED;

4.     Panczner's Motion for Summary Judgment as to Defendant's Comparative

Negligence Defense (ECF No. 91) is GRANTED and Fraser is PROHIBITED

from suggesting, personally or through his witnesses, that general surgeons

practicing in Aspen, or more generally in rural/mountain communities, are subject

to a lower or different standard of care than general surgeons practicing in larger

metropolitan areas;

5.     Judge Gallagher's September 14, 2018 order (ECF No. 95) is VACATED AS

MOOT;

6.     Fraser's Objection to Magistrate's Order Denying Defendant's Motion to Strike

Dr. O'Brien (ECF No. 99) is OVERRULED AS MOOT;

7.     Expert discovery is reopened for the limited purpose of Fraser obtaining a

rebuttal to Dr. Zafren's standard-of-care opinion, as follows:

a.   Fraser shall make a rebuttal expert disclosure on or before **April 10, 2019**; and

b.   Panczner may depose that expert on or before **May 3, 2019**; and

8.   The parties shall contact Judge Gallagher's chambers no later than **March 14, 2019** to set a Final Pretrial Conference subsequent to May 3, 2019 (if Fraser pursues the additional expert discovery authorized above) or at Judge Gallagher's earliest convenience (if Fraser elects to forego the additional expert discovery authorized above).

Dated this 11th day of March, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge